```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT
------------------------------------------------------------------x
                                              :
BARBARA CARROLL,                              :   3:11 cv 01009 VLB
                                              :
              Plaintiff,                      :
                                              :
   – against –                                :   April 23, 2012
                                              :
THE HARTFORD LIFE AND ACCIDENT                :
INSURANCE COMPANY,                            :
                                              :
              Defendant.                      :
                                              :
------------------------------------------------------------------x
```

### Hartford's Local Rule 56(a)(1) Statement

Defendant, Hartford Life and Accident Insurance Company ("Hartford"), "), by its attorneys, Begos Horgan & Brown LLP, contends that there is no genuine issue to be tried with respect to the following material facts:

**A.   The Policy**

    1.    Hartford issued policy number GL/GLT/GRH-854371 ("Policy") to Partners for Community ("Partners"), pursuant to which Partners funded an LTD benefit for its employees (among other benefits) (H1-9; the Administrative Record is numbered Hartford 000001 through 000303 and is annexed hereto; we will refer to it in this brief as "H__").

    2.    The Policy incorporated various Certificates of Insurance (H9, 10-86), including one setting forth the terms of LTD coverage (H32-52).

    3.    The Policy gave Hartford "discretionary authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (H44).

4. The Policy defined disability, in pertinent part, to mean: "You are prevented from performing one or more of the Essential Duties of ... Your Occupation during the Elimination Period" due to injury or sickness (H45).

5. "Your Occupation means Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location." (H48).

6. "Essential Duty means a duty that: 1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed. Your ability to work the number of hours in Your regularly scheduled work week is an Essential Duty." (H46).

7. "Elimination Period" is "the longer of the number of consecutive days at the beginning of any one period of Disability which must elapse before benefits are payable or the expiration of any Employer sponsored short term Disability benefits or salary continuation program, excluding benefits required by state law." (H45).

8. The Elimination Period for the Policy is 180 days (H34).

9. The Policy required Carroll to submit Proof of Loss to Hartford (H41).

**B. Carroll Made a Claim for LTD Benefits, Which Hartford Denied After Determining She Did Not Submit Sufficient Proof of Disability**

10. Carroll alleges that she became unable to work as of February 6, 2009 due to "SI [sacroiliac] joint dysfunction, L5-S1 derangement, and ensuing pain" (Complaint, ¶ 15).

11. Hartford paid her short-term disability ("STD") benefits from February 6, 2009 to August 9, 2009 (H110).

2

12. Thus, for purposes of Carroll's LTD claim, the Elimination Period ended August 9, 2009.

13. Shortly before Carroll's STD benefits ended, Hartford notified her that she would need to submit a claim for LTD benefits (H111, 303).

14. Hartford cautioned Carroll that payment of STD benefits "is not a rubber stamp for LTD benefits." (H105).

15. In August 2009, Carroll submitted a claim for LTD benefits under the Policy (H234).

16. In it, she stated that she had worked as an A/R Specialist for Partners for the prior nine years, and that her duties were "billed state and federal grants" (H236).

17. She stated that the only physicians and/or professionals who had treated her since February 2009 were Richard Norris and Andrew DiMaggio (H245).

18. Carroll also submitted an Attending Physician's Statement from Dr. Norris, who asserted that Carroll's primary diagnosis was sacroiliac pain, and her secondary diagnosis was lumbar disk herniation (H239-40).

19. Dr. Norris opined that Carroll could only sit, stand and/or walk for thirty minutes at a time, though he noted the times were "variable - not predictable" (H240).

20. Dr. Norris also said that she could never lift more than ten pounds, and could not bend at the waist *(Id.)*.

21. The report of a June 5, 2009 examination by a physician's assistant in Dr. DiMaggio's office revealed the following history: "[S]he has been having difficulty with SI joint pain. She has had some relief with SI joint injections done by a Dr. Norris in the past. The patient was getting approximately 3 months relief from her pain after these

injections were done. However, sometime in late January or early February, this changed. These injections no longer gave her any relief." (H264).

22. Carroll described her pain level on June 5, 2009 as "3/10 in severity" (H264).

23. Carroll also submitted the report of Dr. Norris' August 18, 2009 examination (H241-42). He reported that Carroll told him: "At the present time, she rates her pain as mild to moderate, continuous, aggravated with bending, sitting, and walking, and eased by lying down and with pain medications. The pain is mostly localized to the lumbosacral area." *(Id.)*.

24. On examination, Dr. Norris found: "Manual muscle testing is 5/5 for proximal and distal muscle groups. ... [R]ange of motion in the lower extremities is full and there is no swelling of the lower extremities. Gait and station, unremarkable. Range of motion of the lumbar spine is painful and limited at the endrange of both flexion and extension. Range of motion of the hips, knees, and ankles is within normal limits." (H241-42).

25. In September 2009, Michelle McNamara, RN, a Clinical Case Manager for Hartford, reviewed the available medical evidence, and reported: "Based on medical on file, Dr. Norris's R&Ls [restrictions and limitations] are not supported. It is unclear what EE's [employee's] daily total of sit, stand, walk function is, as AP [attending physician] does not specify. Dr. Norris just advises that EE has 30 mins at a time of sit, stand, and walk function; unclear if EE can perform these functions for an 8 hr day. ... Unclear if lumbar MRI and physical examination findings warrant the severity of Dr. Norris's R&Ls" (H107).

26.     In an effort to obtain answers to these questions, Nurse McNamara wrote to Dr. Norris (H217-18). She asked him to "please clarify daily total of sit, stand and walk functions." (H217).

27.     Dr. Norris responded: "Obviously, I cannot observe her for 8 hours to determine this. All I can do is ask Ms. Carroll for her estimate." (H217).

28.     Nurse McNamara reviewed Dr. Norris' response, and noted that he did not clarify Carroll's restrictions and limitations; Hartford therefore determined that a peer review by a medical doctor specializing in Physical Medicine and Rehabilitation (which Dr. Norris had listed as his specialty (H240)) was warranted (H102-03).

29.     Nurse McNamara sent a letter to Dr. DiMaggio, along with a Physical Capacities Evaluation Form for him to complete (H226-30).

30.     Dr. DiMaggio's office responded on September 24, 2009: "We do not fill out FCE forms" and sent a September 17, 2009 treatment note instead (H223-24).

31.     Dr. DiMaggio's note described Carroll's condition and his treatment as follows: "This patient has a history of LBP [low back pain] and somewhat atypical radiculopathic lower extremity symptoms. Her physical exam is consistent with an element of SI joint dysfunction lumbar facet joint dysfunction[.] ... The patient responded in a positive manner to previously performed diagnostic and therapeutic blocks to these involved painful structures with a long lasting local anesthetic and anti-inflammatory corticosteroid preparation. It is my intention to perform a longer lasting, perhaps permanent radiofrequency lesioning procedure to these involved structures." (H224).

32.     In October 2009, Hartford obtained a peer review from Ephraim Brenman, M.D., board certified in Physical Medicine and Rehabilitation (H205-07).

33.     After reviewing the medical evidence available to him, Dr. Brenman spoke to Dr. Norris, who told him that Carroll "can work 20 hours a week with accommodations, and using a sit-to-stand table. The claimant has a sit-down job." (H205).

34.     Based on his evaluation of the medical evidence and his conversation with Dr. Norris, Dr. Brenman reported on the restrictions and limitations that were appropriate: "The claimant would be able to lift and carry up to 20 pounds on an occasional basis and up to 10 pounds on a frequent basis. The claimant would be able to push/pull up to 25 pounds on an occasional basis. The claimant would be able to sit up to 8 hours during the day and the claimant would be able to stand and walk for 6 hours out of an 8 hour day. The claimant would need about a minute break every 30 minutes for a change in position and to stretch." (H206).

35.     Hartford next obtained an Occupational Analysis from Sally Frenza, a Certified Rehabilitation Counselor (H98, 200-02).

36.     The Frenza analysis revealed that "[Carroll's] Occupation," as defined in the Policy, was Accounts Receivable Clerk, which had a sedentary demand level as that occupation "is recognized in the general workplace." (H48, 98).

37.     By letter dated November 17, 2009, Hartford notified Carroll that it had determined she did not meet the Policy definition of disabled throughout the elimination period (H273-76).

38.    Hartford summarized the relevant Policy terms, the medical evidence it had gathered, and the medical review by Dr. Brenman, before stating its determination: "We considered all of the evidence in your claim file in making our decision. The LTD policy

states that benefits are payable if you are Disabled throughout and beyond the policy's Elimination Period. The combined information in your file does not show that you are unable to perform the Essential Duties of Your Occupation on a full time basis throughout the Elimination Period. Because of this, we must deny your claim for LTD benefits." (H275).

**C.   Carroll Retained Counsel and Administratively Appealed The Determination, and Hartford Upheld Its Prior Determination**

39.     In December 2009, Carroll notified Hartford that she had retained an attorney, Catherine Hancock (H199).

40.     Ms. Hancock contacted Hartford in February 2010 to request a copy of the Policy and the claim file (H198), which Hartford provided (H94).

41.     In May 2010, Ms. Hancock submitted a letter appealing Hartford's determination (H154-88).

42.     The administrative appeal included a notice of an award of Social Security Disability Insurance ("SSDI") benefits, determining that Carroll had become disabled as of July 24, 2009 (H157-59); additional records from Dr. Norris from January 2009 to August 2009 (*i.e.*, up to the date of the treatment notes provided previously) (H175-87); examination notes from Drs. Auletta and Mick at Pioneer Spine and Sports Physicians ("Pioneer") for the period beginning October 2009 (H162-74); the report of a November 15, 2009 MRI (H160-61); and an April 22, 2010 letter from Dr. Mick to Ms. Hancock (H152).

43.     Ms. Hancock did not specifically address the dispute regarding whether Carroll's sitting tolerance limited her to part-time work, or permitted full-time work with

the ability to change positions. Nor did she provide a functional capacity evaluation (H154-88).

44.     Dr. Norris' records revealed an acute flair of pain in February 2009 that had mostly resolved back to "moderate" by July 2009 (before the end of the Elimination Period). (H184).

45.     Specifically, Dr. Norris noted that on February 4, 2009 (two days before Carroll's disability allegedly began), Carroll had a "50 to 60% improvement" following a January 22, 2009 epidural injection (H184).

46.     Dr. Norris wrote: "She can now make it through an 8-hour work day whereas before she really could not work more than 5 or 6 hours. She will still get discomfort with prolonged sitting or bending, and the pain is eased with Vicodin and getting lip and moving around."  (H184)

47.     Dr. Norris reported that, on February 10, 2009, Carroll returned "in acute pain." (H182).

48.     Dr. Norris reported that, on February 14, 2009, Carroll had an MRI, which Dr. Norris compared to an earlier MRI, and reported "[n]o new abnormality was detected and a small disc extrusion earlier seen at LS-SI had gotten slightly smaller." (H180).

49.     Dr. Norris reported that, on February 26, 2009, Carroll "is rather better now with her describing the pain as mild-to-moderate. It is definitely helped by the SI compression brace and with her pain medications and it is aggravated with sitting and bending" (H180).

50.     Dr. Norris reported that, on April 10, 2009, "[h]er back pain is moderate to severe" (H179). "She is not doing well with having increased her work hours to six hours

three days a week. I have given her a note to have her drop her work hours back down to four hours three days a week on in an indefinite basis" *(Id.)*.

51. Dr. Norris reported that, on April 10, 2009, "She is not doing well with having increased her work hours to six hours three days a week. I have given her a note to have her drop her work hours back down to four hours three days a week on in an indefinite basis" (H179).

52. Dr. Norris reported that, on July 9, 2009, "[s]he has had some improvement with that procedure [radiofrequency lesioning]. She says her pain is now moderate and intermittent whereas before it was severe and constant. ... The pain medication is keeping her symptoms under control and things are noticeably improved" (H177).

53. By October 21, 2009, according to Dr. Auletta, Carroll was complaining of pain that was "worse with prolonged sitting, and with prolonged standing or ambulating" (H172). His note did not explain what length of time qualified as "prolonged," or what effect frequent changes of position had.

54. In his April 22, 2010 letter to Ms. Hancock, Dr. Mick reported that "[i]n approximately June of 2009 her pain became too severe to continue to perform her job as an office worker which required prolonged sitting in a chair and she stopped working." (H152).

55. Dr. Mick said that Carroll was unable to perform sedentary work beginning in "the summer of 2009" (H152).

56. Dr. Mick reported that, because of the worsening of Carroll's condition beginning in the summer of 2009, Carroll had elected to have back surgery, which was scheduled for May 2010 (H152).

57. There is no indication that Dr. Mick considered Carroll's ability to change positions while at work, so as to avoid "prolonged sitting in a chair." (H152)

58. In July 2010, Hartford obtained a medical review of all of the evidence in the file by E. Franklin Livingstone, MD, board certified in physical medicine and rehabilitation (H133-38).

59. As part of his review, Dr. Livingstone contacted Dr. DiMaggio, who said that he had not seen Carroll since September 17, 2009, and that "he had no opinions relative to her functionality because of the fact that he has had no recent contact with her." (H134).

60. Dr. Livingstone also spoke with Dr. Norris, who told him: "there were no cognitive problems and that there were no problems with adverse side effects from current medications" (H135-36).

61. Dr. Livingstone then wrote: "I asked Dr. Norris, if in his opinion, Ms. Carroll was physically capable of sedentary level work activities and he said that it was 'hard to answer, that she could work up to 20 hours per week but would need a sit/stand table.'" (H135-36).

62. Dr. Livingstone also spoke with Dr. Mick, and reported the following: "He said that the last visit was on 6/2/10 for a postoperative follow-up and that Ms. Carroll was 'coming along nicely.' He said that she was able to sit, stand, and walk in his office without qualifications. He said that physical findings at this point were simply low back

pain complaints. He said that there were no problems related to cognitive function and no problems with side effects from current medications[.]" (H137).

63. Dr. Mick stated that Carroll "would be able to return to sedentary or light duty work activities full-time, 4-6 months postoperatively, which would be sometime between 9/11/10 and 11/11/10." (H137).

64. Based on his review and his conversations with Carroll's doctors, Dr. Livingstone gave his conclusions regarding Carroll's functional capacity both before, and after, her surgery. He first stated: "Between 2/9/09 and 5/11/10, Ms. Carroll was minimally physically capable of sedentary level work activities on a full-time basis with the proviso of frequent position changes and simple stretching at workstation every 20 minutes to prevent the development and progression of stiffness and pain." (H138).

65. After the surgery, Dr. Livingstone agreed with Dr. Mick's opinion that Carroll would be able to return to work by November 2010 (H138).

66. By letter dated July 15, 2010, Hartford notified Ms. Hancock that it was upholding the determination denying the claim (H129-32).

67. Hartford summarized, at length, the contents of the medical evidence Carroll had submitted, Dr. Livingstone's conversations with Carroll's doctors, and Dr. Livingstone's conclusions. Hartford then explained its determination as follows: "Dr. Livingstone noted she remained minimally capable of at least sedentary work [from February 9, 2009 to May 11, 2010] with the only restriction of frequent changes of position at her desk. Ms. Carroll's occupation as an Accounts Receivable Clerk is performed at a sedentary physical demand level in the general workplace. Therefore, based on Dr. Livingstone's conclusions, it is reasonable that Ms. Carroll remained

11

capable of continuing her own occupational job duties up to the date she underwent surgery on May 11, 2010. As such, the denial of Ms. Carroll's claim was appropriate." (H132).

68.	Hartford continued with its explanation: "Based upon the provisions of the Policy, benefit payment for Disability requires a finding that you are prevented by injury or sickness from performing the essential duties of your occupation. The medical information made available for review, in its totality, does not corroborate Ms. Carroll's report of limitations in function preventing her from performing her occupational activities. Our assessment of the information provided by her physicians has been confirmed by means of review of her records with a variety of specialties, including the assessment of a previous independent physician, and a review obtained specifically in the course of this appeal." (H132)

69.	Hartford continued: "Accordingly, although the documentation does support that Ms. Carroll is diagnosed with medical conditions, and did eventually undergo back surgery on May 11, 2010, the record, as detailed in this letter, does not corroborate that she satisfies the policy definition of Disability as of her date of loss on February 9, 2009 and ongoing until May 11, 2010 and, as such, we must maintain the initial claim decision to deny Ms. Carroll's request for LTD benefits." (H132).

BEGOS HORGAN & BROWN LLP

By S/ Patrick W. Begos
    Patrick W. Begos ct19090
Attorneys for Defendants
2425 Post Road
Southport, CT 06890
(203) 254-1900
pwb@begoshorgan.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2012, a copy of foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all appearing parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

S/ Patrick W. Begos