**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **BARBARA CARROLL,** | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION NO.** |
| **v.** | : | **3:11-CV-01009 (VLB)** |
| | : | |
| **HARTFORD LIFE & ACCIDENT** | : | |
| **INSURANCE COMPANY,** | : | |
| **Defendant.** | : | **MARCH 28, 2013** |

**MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT [Dkt. #22] AND DENYING PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGMENT [Dkt. #25]**

**I.      Introduction**

The Plaintiff, Barbara Carroll ("Carroll"), brings this action against the

Defendant Hartford Life and Accident Insurance Company ("Hartford") pursuant

to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§1001, et seq., and arising from a denial of her claim for Long Term Disability

benefits under an employee welfare plan.  Carroll contends that she was denied

LTD benefits despite substantial medical evidence supporting her claim for

benefits, and alleges that Hartford failed to provide a full and fair review in its

denial.  Currently pending before the Court are Plaintiff's and Defendant's cross

motions for summary judgment.  For the reasons that follow, the Defendant's

Motion for Summary Judgment is GRANTED and the Plaintiff's Motion for

Summary Judgment is DENIED.

1

II.   **Factual Background**

The following facts relevant to the Defendant's and Plaintiff's cross motions for summary judgment are derived from the administrative record and the parties' filings and are undisputed unless otherwise noted.

Barbara Carroll was employed by Partners for Community ("Partners") as an Accounts Receivable Specialist.  [Dkt. 23-6, H236].  The Hartford Life and Accident Insurance Company issued to Partners a welfare benefit plan (the "Policy") which provided for, among other things, short term disability ("STD") and long term disability ("LTD") benefits for Partners' employees.  [Dkt. 23-1, H1-H9; Dkt. 23-2, H80].  "All Full-time Active Employees" were eligible for coverage under the Policy.  [Dkt. 23-2, H34].  Full-time employment is defined as "at least 30 hours weekly" and an "Active Employee" is defined as "an Employee who works for the Employer on a regular basis in the usual course of the Employer's business [for at least 30 hours weekly]."  [Dkt. 23-2, H34, H45].  Pursuant to the Policy, Hartford maintained "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy." [Dkt. 23-2, H44; Dkt. 23, D's 56(a)(1) Stmnt. ¶3].

In terms of long term disability benefits, the Policy provides that "[w]e will pay You a Monthly Benefit if You: 1) become Disabled while insured under The Policy; 2) are Disabled throughout the Elimination Period; 3) remain Disabled beyond the Elimination Period; and 4) submit Proof of Loss to Us."  [Dkt. 23-2, H37].  Disability for purposes of LTD benefits means that "You are prevented from

performing one or more of the Essential Duties of: 1) Your Occupation during the Elimination Period; 2) Your Occupation, for the 2 year(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and 3) after that, Any Occupation." [Dkt. 23-2, H45; Dkt. 23, D's 56(a)(1) Stmnt. ¶4].

The Policy specifies that "Your Occupation means Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location." [Dkt. 23-2, H48; Dkt. 23, D's 56(a)(1) Stmnt. ¶5]. "Essential Duty means a duty that: 1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed." [Dkt. 23-2, H46; Dkt. 23, D's 56(a)(1) Stmnt. ¶6]. Critically, the Policy states that "Your ability to work the number of hours in Your regularly scheduled work week is an Essential Duty." [Dkt. 23-2, H46; Dkt. 23, D's 56(a)(1) Stmnt. ¶6]. The "Elimination Period is "the longer of the number of consecutive days at the beginning of any one period of Disability which must elapse before benefits are payable or the expiration of any Employer sponsored short term Disability benefits or salary continuation program, excluding benefits required by state law." [Dkt. 23-2, H45; Dkt. 23, D's 56(a)(1) Stmnt. ¶7]. The "Elimination Period" for the Policy is 180 days. [Dkt. 23-2, H34; Dkt. 23, D's 56(a)(1) Stmnt. ¶8].

The Policy provides that "On any claim, You or Your representative may appeal to Us for a full and fair review." [Dkt. 23-2, H42]. Upon appeal, a claimant "may submit written comments, documents, records and other information

**3**

relating to your claim." [Dkt. 23-2, H83].  The Policy describes the standard of review on appeal as follows:

> The Insurance Company's review on appeal shall take into account all comments, documents, records and other information submitted by you relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

[Dkt. 23-2, H83].  The Policy further states:

> The individual reviewing your appeal shall give no deference to the initial benefit decision and shall be an individual who is neither the individual who made the initial benefit decision, nor the subordinate of such individual. . . When deciding an appeal that is based in whole or part on medical judgment, we will consult with a medical professional having the appropriate training and experience in the field of medicine involved in the medical judgment and who is neither an individual consulted in connection with the initial benefit decision, nor a subordinate of such individual.

[Dkt. 23-2, H83].

## I.    Carroll's Long Term Disability Claim

Hartford paid Carroll short term disability benefits from February 9, 2009 to August 9, 2009.  [Dkt. 23-3, H110; Dkt. 23, D's 56(a)(1) Stmnt. ¶11; Dkt. 28, P's 56(a)(2) Stmnt. ¶11].  Thus, for purposes of Carroll's LTD claim, the Elimination Period ran from February 9, 2009 to August 9, 2009, when Carroll's STD benefits expired.  [Dkt. 23, D's 56(a)(1) Stmnt. ¶12].

On or around August 28, 2009 Carroll submitted a claim for LTD benefits under the Policy to Hartford.  [Dkt. 23-6, H234; Dkt. 23, D's 56(a)(1) Stmnt. ¶15].  In

4

her claim application Carroll stated that she had worked as an "A/R Specialist" for the prior nine years, and in describing her duties, she said she "billed state and federal grants." [Dkt. 23-6, H236; Dkt. 23, D's 56(a)(1) Stmnt. ¶16]. Carroll identified Richard R. Norris, M.D. as the physician who had first treated the disability for which she was seeking benefits, and specified that she had been seen between February 10, 2009 and August 18, 2009 by him. [Dkt. 23-6, H237]. Carroll also identified Andrew DeMaggio, M.D. as having seen her between April 22, 2009 and June 5, 2009. [*Id.*] Both physicians are physical medicine and rehabilitation providers; Carroll listed no other treating physicians or medical professionals in her claim application. [*Id.*; Dkt. 23, D's 56(a)(1) Stmnt. ¶17]. The record of Hartford's initial LTD determination and the appeal of that determination do not include Carroll's STD file.

In support of Carroll's claim for LTD benefits, Dr. Richard Norris completed an Attending Physician's Statement of Continued Disability dated August 18, 2009. [Dkt. 23-6, H239-H242]. Dr. Norris asserted that Carroll's symptoms were pain in her low back and legs and identified her primary diagnosis as sacro-iliac pain ("SI" pain) and her secondary diagnosis as lumbar disk herniation. [Dkt. 23-6, H239; Dkt. 23, D's 56(a)(1) Stmnt. ¶18]. Dr. Norris reported that Carroll could sit, stand, or walk for thirty minutes at a time, and reported that the hours per day that she could perform these activities were "variable – not predictable." [Dkt. 23-6, H240; Dkt. 23, D's 56(a)(1) Stmnt. ¶19]. Dr. Norris also concluded that Carroll could "occasionally" lift or carry up to ten pounds, but never more, and could never bend at the waist or kneel or crouch. [Dkt. 23-6, H240; Dkt. 23, D's 56(a)(1)

5

Stmnt. ¶20].  Norris listed Carroll's treatment plan as "repeat radiofrequency denervation.  Injections up to 4x yr" and reported that Carroll was taking both Oxycontin and oxycodone.  [Dkt. 23-6, H239].  He further reported that he had referred Carroll to Dr. A. DeMaggio on April 22, 2009.  [Dkt. 23-6, H239].

Dr. Norris also conducted a follow-up consultation with Carroll on August 18, 2009, and submitted his notes from this visit along with his Attending Physician's Statement.  [Dkt. 23-6, H241].  In this note Dr. Norris reported that he had last seen Carroll on July 9, 2009 and that her SI pain had been managed "primarily with medications," including 5 to 10 mg of oxycodone twice daily and 10 mg of Oxycontin every twelve hours.  [Dkt. 23-6, H241].  He further noted that "[s]he has had a lot of treatment including injections, bracing, physical therapy, and radiofrequency lesioning, but still had moderate amounts of pain."  [*Id.*].  Dr. Norris reported that "[a]t the present time, [Carroll] rates her pain as mild to moderate, continuous, aggravated with bending, sitting, and walking, and eased by lying down and with pain medications.  The pain is mostly localized to the lumbosacral area."  [Dkt. 23-6, H241; Dkt. 23, D's 56(a)(1) Stmnt. ¶23].  Upon physical examination, Dr. Norris found that:

> [t]he patient has moderate pain on palpation and stress testing over the bilateral sacroiliac joints and positive SI stress testing.  Minimal sciatic notch tenderness.  Pain on palpation over the iliolumbar ligaments at the medial aspect of the iliac crest.  Straight leg raise and slump test cause only back pain but no radiating leg pain.  Manual muscle testing is 5/5 for proximal and distal muscle groups.  Reflexes are 2+ at the knees and ankles.  Sensation is intact to light touch.  Pulses are palpable, range of motion in the lower extremities is full

> and there is no swelling of the lower extremities.  Gait
> and station, unremarkable.  Range of motion of the
> lumbar spine is painful and limited at the end-range of
> both flexion and extension.  Range of motion of the hips,
> knees, and ankles is within normal limits.[1]

[Dkt. 23-6, H241; Dkt. 23, D's 56(a)(1) Stmnt. ¶24].  Norris also noted that Carroll

had a "radiofrequency [lesioning procedure] on May 14, 2009 with 7 to 10 days of

good improvement" and a "sacroiliac injection on June 25, 2009, which brought

her 4 weeks of relief."  [Dkt. 23-6, H241].  Carroll's treatment plan called for a

repeat of the sacroiliac injection to "further reduce the pain medication if

possible."  [*Id*.].  Norris reported that Carroll "[s]aid she lost her job as she was

let go because she could not return to work full time."  [*Id*.].

Carroll also provided in her claim (and Dr. Norris referenced in his

Attending Physician's Statement) a report of an MRI she underwent on February

14, 2009 and which had been performed at Dr. Norris' request.  [Dkt. 23-6, H243-

H244].  The MRI noted at "L5-S1 a focal right paracentral disc protrusion. . .

causing regional mass effect on the thecal sac and posteriorly displacing the S1

nerve root," and which appeared "slightly smaller than on prior examination."

[Dkt. 23-6, H243].  No new left sided component was apparent.  [*Id*.].

Additionally, Carroll included with her application a June 5, 2009

Ambulatory Note from a follow-up visit at Dr. DeMaggio's office.[2]  Carroll was

---

[1] Dr. Norris's physical examination findings from Carroll's visits on 2/26/09,
4/10/09, 7/9/09, and 8/18/09 are identical except for Carroll's pain level on
palpation and stress testing over the left sacroiliac joints.
[2] Dr. Norris reported in his Attending Physician's Statement that he had referred
Carroll to Dr. DeMaggio on April 22, 2009.  [Dkt. 23-6, H239].

7

seen by Glenda Boykin, PA,[3] from Dr. DeMaggio's practice for a routine follow up on this date to "assess how well she did with the radiofrequency denervation" of her SI joint on May 14, 2009.  [Dkt. 23-6, H262].  Boykin reported that a review of Dr. DeMaggio's notes from Carroll's initial visit on April 22, 2009 revealed that Carroll

> has been having difficulty with SI joint pain.  She has had some relief with SI joint injections done by a Dr. Norris in the past.  The patient was getting approximately 3 months relief from her pain after these injections were done.  However, sometime in late January or early February [2009], this changed.  These injections no longer gave her any relief.

[Dkt. 23-6, H262; Dkt. 23, D's 56(a)(1) Stmnt. ¶21].

Boykin further reported that Carroll had been referred to the practice to "see whether or not a radiofrequency denervation would help with her pain control," a procedure which was then performed on May 14.  [Dkt. 23-6, H262].  Carroll reported "no relief [from the procedure] for the first 5 days after the injection and in fact had increased pain.  Five days after this, she had 75% relief from her pain for 5 days.  She states that after those 5 days were over, she slowly returned to baseline."  [*Id.*].  Carroll rated her pain at this visit as a "3/10 in severity" and reported feeling that she was "the same overall."  [Dkt. 23-6, H262; Dkt. 23, D's 56(a)(1) Stmnt. ¶22].  Boykin further noted:

---

[3] Boykin's Ambulatory Note from this visit reports that Dr. DeMaggio was unexpectedly called away from the office, thereby necessitating that Carroll be placed on Boykin's schedule instead.

> She has intermittent, achy pain in her lower back.  She
> occasionally has radicular pain in her left leg from her
> hip to her knee.  The patient says that she does have
> some slight relief of this pain with Neurontin . . . [s]he
> feels that the oxycodone and OxyContin . . . help to a
> minimal degree.

[Dkt. 23-6, H262].  Boykin reported that Carroll was "very upset" that the May 9

procedure had not provided more relief, and also that "[s]he feels that she cannot

plan anything with this pain.  Her life has been severely limited secondary to the

pain."  [*Id.*]

Upon physical examination, Boykin found that Carroll's "gait is not

antalgic.  It is narrow-based and stable," and that Carroll was in "no acute

distress."  [Dkt. 23-6, H262, H263].  Boykin noted:

> The patient complains of moderate discomfort on
> palpation over the upper poles of each buttock.  She
> also has some mild discomfort on palpation over the
> spinous processes of her lumbar spine.  She has a
> moderate discomfort with rotational motion at her
> lumbar spine, which is full.  She has more pain with
> rotational and lateral movement to the right than to the
> left.  During these instances, the pain that she has is
> primarily located over her left upper buttock.  She
> denies any radicular pain with range of motion of her
> lumbar spine.  Extension of her back is limited to less
> than 5 degrees before she begins to complain of pain.

[Dkt. 23-6, H263].  Boykin diagnosed Carroll's complaint as "bilateral sacroiliac

joint dysfunction."  [*Id.*].  Notably, none of Carroll's treating physicians opined

that she was totally disabled or unable to work.

II.     <u>Hartford Denies Carroll's Claim for Long Term Disability Benefits</u>

On or around September 14, 2009 Carroll's claim and supporting medical records, including Dr. Norris's Attending Physician Statement, Carroll's MRI report, and the June 5, 2009 report of PA Boykin, were reviewed by Michelle J. McNamara, RN, a Clinical Case Manager ("CCM") for Hartford.  [Dkt. 23-3, H107; Dkt. 23, D's 56(a)(1) Stmnt. ¶25].  McNamara reported that

> [b]ased on medical on file, Dr. Norris's R&L [restrictions and limitations] are not supported.  It is unclear what EE's [employee's] daily total of sit, stand, walk function is, as AP [attending physician] does not specify.  Dr. Norris just advises that EE has 30 mins at a time of sit, stand, and walk function; unclear if EE can perform these functions for an 8 hr day . . . Unclear if lumbar MRI and physical examination findings warrant the severity of Dr. Norris's R&Ls.

[Dkt. 23-3, H107; Dkt. 23, D's 56(a)(1) Stmnt. ¶25].  She further noted that she would contact Dr. Norris to clarify what the daily totals of Carroll's sit, stand, and walk functions were and whether they could be performed for an eight hour day. [Dkt. 23-3, H107].

On September 16, 2009, McNamara noted in Carroll's Hartford file that Dr. Norris's exam findings from August 18, 2009 "indicate[d] only mod pain, no leg pain per SLR testing, Gait and station unremarkable;" she further noted that Dr. Norris would be returning her call to "discuss and clarify EE's R&L's."  [Dkt. 23-3, H107].

McNamara wrote to Dr. Norris on September 21, 2009 asking him to "clarify daily total of sit, stand, walk functions," as well as Carroll's reaching ability and her anticipated treatment plan.  [Dkt. 23-5, H217-218; Dkt. 23, D's 56(a)(1) Stmnt.

¶26].  Regarding how many hours per day he anticipated that Carroll could perform these sit, stand, and walk functions, Dr. Norris responded in writing "UNKNOWN" and "OBVIOUSLY, I cannot observe her for 8 hrs, to determine this. ALL I CAN DO IS <u>ASK</u> MS. CARROLL FOR HER ESTIMATE." [Dkt. 23-5, H217; Dkt. 23, D's 56(a)(1) Stmnt. ¶27].  Dr. Norris also clarified that Carroll was "OK" to frequently reach above her shoulder and at her waist, but that she could not frequently reach below her waist, and that "severe LBP [low back pain] precludes freq. bend @ waist."  [Dkt. 23-5, H217].  Dr. Norris clarified that Carroll's treatment plan included repeating the radiofrequency lesioning and adjusting her pain medications.  [Dkt. 23-5, H217].

On September 24, 2009 McNamara sent Dr. DeMaggio a request for him to clarify Carroll's capacities to sit, stand, and walk and requested that he complete a "Physical Capacities Evaluation Form."  [Dkt. 23-6, H225-H230; Dkt. 23, D's 56(a)(1) Stmnt. ¶29].  Dr. DeMaggio's office promptly responded that "We do not fill out functional capacity forms" and instead sent a September 17, 2009 treatment note.  [Dkt. 23-6, H222-H224; Dkt. 23, D's 56(a)(1) Stmnt. ¶30].

On September 17, 2009 Dr. DeMaggio's diagnosis of Carroll's condition was "sacroilitis/lumbar spondylosis" and he described her condition and treatment as follows:

> This patient has a history of LBP [low back pain] and somewhat atypical radiculopathic lower extremity symptoms.  Her physical exam is consistent with an element of SI joint dysfunction lumbar facet joint dysfunction likely on the basis of a remote traumatic hemarthrosis and subsequent chronic synovitis.  The

> **patient responded in a positive manner to previously performed diagnostic and therapeutic blocks to these involved painful structures with a long lasting local anesthetic and anti-inflammatory corticosteroid preparation.  It is my intention to perform a longer lasting, perhaps permanent radiofrequency lesioning procedure to these involved structures.**

[Dkt. 23-6, H224; Dkt. 23, D's 56(a)(1) Stmnt. ¶31].  DeMaggio performed radiofrequency lesioning on Carroll during the visit.  [*Id.*]

On September 28, 2009, McNamara recorded in Carroll's Hartford file Dr. Norris' response, noting that he had not clarified Carroll's R&L's and had reported Carroll's capacity to sit, stand, or walk as unknown.  McNamara further noted that Dr. DeMaggio was not willing to provide Carroll's R&L's.  [Dkt. 23-3, H103; Dkt. 23, D's 56(a)(1) Stmnt. ¶28].  On September 29, 2009 Hartford determined that, because Carroll's physicians were unable to clarify her level of function and because the information in Carroll's records did not clearly document her functionality, her file required a peer review by a physical medicine and rehabilitation physician. [Dkt. 23-3, H102-H103; Dkt. 23, D's 56(a)(1) Stmnt. ¶28].

On or about October 15, 2009, Hartford obtained a Peer Review Report from Dr. Ephraim Brenman, D.O., Board certified in Physical Medicine & Rehabilitation. [Dkt. 23-5, H204-H207; Dkt. 23, D's 56(a)(1) Stmnt. ¶32].  Dr. Brenman reviewed all medical records available to him, which included Dr. Norris's August 18, 2009 office note, Carroll's February 14, 2009 MRI report, Dr. DeMaggio's September 17, 2009 treatment note, and Physician's Assistant Boykin's treatment note from

June 5, 2009.  [Dkt. 23-5, H205].  He also spoke with Dr. Norris by telephone, who advised Brenman that Carroll's functional capacity was "best answered by an FCE [functional capacity examination]" and that she "can work 20 hours a week with accommodations, and using a sit-to-stand table.  The claimant has a sit-down job."  [Dkt. 23-5, H205].  Dr. Norris also advised that Carroll "does not want to have surgery."  [*Id.*].

Brenman summarized in his Report the findings in the various medical records available to him and, based on his review concluded that

> In my medical opinion, due to the fact the claimant has an L5-S1 disc protrusion as well as SI joint pain and dysfunction, the claimant would be limited in terms of ability to lift and carry.  The claimant would be able to lift and carry up to 20 pounds and push and pull up to 25 pounds.  The claimant would be able to reach at waist level and above the shoulder on a frequent basis as well as occasionally below the waist level.  The claimant would have no limitations to handle, finger and feel.  The claimant would be able to sit up to 6-8 hours during the day.  The claimant would need about a minute break for 30 minutes at a time.  The same goes for standing and walking as well.
>
> …
>
> This is due to the fact that the claimant does not have true radiculopathy without any examination findings consistent with any neurological changes or electrodiagnostic studies as well.  The claimant's main pain is from the SI joint pain/dysfunction.

[Dkt. 23-5, H205-H206].  Dr. Brenman concluded that "[i]n my medical opinion, the claimant would be able to work at a light physical demand level up to 40 hours per week according to the Dictionary of Occupational Titles."  [*Id.*].

Hartford asked Brenman to clarify his conclusions as to Carroll's sitting, standing and walking frequencies, which Brenman then clarified in his report as follows: "[t]he claimant would be able to sit up to 8 hours during the day and the claimant would be able to stand and walk for 6 hours out of an 8 hour day.  The claimant would need about a minute break every 30 minutes for a change in position and to stretch."  [Dkt. 23-5, H206].

Hartford's case file notes reveal that on October 22, 2009, Hartford obtained an Occupational Analysis from Sally Frenza, MS, CRC, CCM.  [Dkt. 23-2, H98-H99]. The file notes that although Carroll's own occupation as defined by Partners was Accounts Receivable Specialist with a light demand level, this occupation in the general economy was classified as an Accounts Receivable Clerk with a sedentary demand level defined as "Lifting, Carrying, Pushing, Pulling 10 Lbs. occasionally.  Mostly sitting, may involve standing or walking for brief periods of time."  [Dkt. 23-2, H98; Dkt. 23-5, H200-202].

By letter dated November 17, 2009, Hartford informed Carroll that it had determined that she "did not meet the policy definition of Disabled throughout the Elimination Period" and that her claim for LTD benefits was thus denied.  [Dkt. 23-7, H273 – Dkt. 23-8, H276].  The Letter summarized the Policy's relevant terms and definitions (including "Disability or Disabled," "Your Occupation," "Essential Duty," and "Elimination Period").  The Letter stated that the denial of her LTD claim was based on a review of "all of the medical information" in Carroll's file, including "[t]he Employee sections of the Application for Long Term Disability Income benefits received on September 2, 2009," Dr. Norris's Attending

**14**

Physician's Statement signed on August 18, 2009, office notes and medical records from Drs. Norris and DeMaggio, Carroll's job description from her employer, the Occupational Analysis performed on October 22, 2009, and the Peer Review Reports from Dr. Brenman.  [Dkt. 23-7, H273 – Dkt. 23-8, H276].

The Letter summarized Dr. Norris's conclusions and further reported that

> The Peer Review Reports completed by Dr. Ephraim Brenman included conversation with Dr. Norris.  In the conversation Dr. Norris stated you can work 20 hrs per week with accommodations, and using sit to stand table.
>
> …
>
> Dr. Brenman stated upon review of medical and conversation with Dr. Norris, you have an L5/S1 joint pain and dysfunction.  You would have restrictions and limitations in terms of lifting and carrying.  The information in the records doesn't identify that you have radiculopathy.  The examination findings are not consistent with any neurological changes or electrodiagnositic [sic] studies as well.  Your main pain is from the SI joint/pain dysfunction.  Dr. Brenman is of the opinion that you are capable of performing at a light demand level up to 40 hours per week with the following restrictions and limitations: lift/carry; up to 20 lbs, push/pull: up to 25 lbs, Reach at waist, above shoulder frequently, Reach below waist occasionally, no limitations to handle, finger and feel Sit up to 6-8 hrs per day with a minute break every 30 minutes for a change of position and to stretch.

[Dkt. 23-8, H275].

Hartford noted that a comparison of Dr. Brenman's findings with the Essential Duties of "Accounts Receivable Clerk" led it to decide that Carroll was

able to perform the duties of an Accounts Receivable Clerk.  [Dkt. 23-8, H275].

Hartford concluded that

> We considered all of the evidence in your claim file in
> making our decision.  The LTD policy states that
> benefits are payable if you are Disabled throughout and
> beyond the policy's Elimination Period.  The combined
> information in your file does not show that you are
> unable to perform the Essential Duties of Your
> Occupation on a full time [sic] throughout the
> Elimination Period.  Because of this, we must deny your
> claim for LTD benefits.

[Dkt. 23-8, H275].  The letter also informed Carroll of her right to an appeal.  [*Id.*].

### III.   Carroll Appeals

On or around May 6, 2010 Carroll appealed Hartford's decision through

counsel.  [Dkt. 23-4, H154-H188; Dkt. 23, D's 56(a)(1) Stmnt. ¶¶39-41].  Carroll's

counsel's cover letter provided with her appeals materials noted that Carroll was

scheduled for "spinal reconstructive surgery with an L5-S1 fusion on May 11,

2010."  [Dkt. 23-4, H154].  Carroll also supplemented her claim file with several

items of "new and material evidence," including a notice of an award of Social

Security Disability Insurance ("SSDI") benefits, treatment records from Drs.

Auletta and Mick at Pioneer Spine and Sports Physicians from October 21, 2009

to January 21, 2010, a November 15, 2009 MRI report, additional treatment notes

from Dr. Norris, and a letter from Dr. Charles Mick to Carroll's attorney dated April

22, 2010.  [Dkt. 23-4, H154].

The treatment notes from Dr. Norris reveal that Carroll received a sacro-

iliac injection from Dr. Norris on January 22, 2009 and that, at a follow up visit on

**16**

February 4, 2009, she had had a "50 or 60% improvement" in her back pain.[4]  [Dkt. 23-4, H187, H184-185].  Dr. Norris reported that

> [s]he can now make it through an 8-hour work day whereas before she really could not work more than 5 or 6 hours.  She will still get discomfort with prolonged sitting or bending, and the pain is eased with Vicodin and getting up and moving around.  She also gets relief with the SI compression brace.  The pain is localized to the lumbrosacral area, but she has continuous numbness in the right leg, which is worse with sitting and bending.

[Dkt. 23-4, H184].  Physical examination revealed no weakness of the right L5 and S1 muscles, full range of motion, nonantalgic gait and station, mild tenderness to palpation over the bilateral SI joints, and some discomfort at the end range of lumbar extension and side bending.  [*Id.*].

Carroll returned to Dr. Norris a few days later on February 10, 2009 "in acute pain," complaining of "acute left-sided low back pain with radiation into the right groin area" and with a "very sudden onset" when Carroll "could not get out of bed," although no specific injury or accident prompted the pain.  [Dkt. 23-4, H182].  Norris noted that Carroll "rated the pain as severe and constant, aggravated by almost any movement or activity and eased only somewhat by holding completely still."  [*Id.*].  Dr. Norris stated that Carroll "had been doing much better at [the time of her February 4, 2009 visit] reporting that she could then make it through an 8-hour work day and that she was having less pain and

---

[4] Both of these dates predate the Elimination Period, which began on February 9, 2009.

less frequent pain, although she still did have some pain that she rated as moderate." [Dkt. 23-4, H182]. Physical examination revealed the following:

> [Carroll] was exquisitely tender to palpation over the left SI joint. The right side was nontender. She had some discomfort on palpation over the lumbosacral junction. Straight leg raise and slump test on the left were very painful for her low back, but did not cause any radiating symptoms. Same on the right. Reflexes were 2+ at the knees and ankles, although there was a sensory deficit . . . on the right side. Motor testing was very difficult to do proximally because of her pain. Distally, there was normal strength about the ankles.

[*Id.*].

Dr. Norris ordered a lumbar MRI and began Carroll on oxycodone and Oxycontin, but on February 11, 2009 "she was still in severe pain" so he increased the dosages. [Dkt. 23-4, H182]. The following day Carroll "seemed to be doing somewhat better." [Dkt. 23-4, H182].

Carroll received a lumbar epidural steroid injection on February 12, 2009 from Dr. Norris. [Dkt. 23-4, H186]. She followed up with him on February 26, 2009. Dr. Norris noted in his consultation notes that Carroll underwent a lumbar MRI on February 14, 2009 (discussed previously above) and that "[n]o new abnormality was detected and a small disc extrusion earlier seen at L5-S1 had gotten slightly smaller." [Dkt. 23-4, H180]. Dr. Norris reported that the L5-S1 epidural injection he had given her on February 12 had "seemed to bring her a little bit of relief, but not dramatically so." [*Id.*]. Further, Dr. Norris reported that Carroll

> is rather better now with her describing the pain as mild-
> to-moderate.  It is definitely helped by the SI
> compression brace and with her pain medications and it
> is aggravated with sitting and bending.  It is localized to
> the right sacroiliac area.  The left side is relatively
> nonpainful at the present time although most of her pain
> was on the left side during this acute episode.

[Dkt. 23-4, H180].  Dr. Norris noted that Carroll had been out of work since

February 9, but felt "ready to start gradually transition [sic] back to work;" he

concluded that she could start off with four hours per day either two or three

days a week and gradually work her way up to more hours.  [Dkt. 23-4, H180].

Physical examination of Carroll revealed

> The patient has moderate pain on palpation and stress
> testing over the left sacroiliac joints and positive SI
> stress testing.  Minimal sciatic notch tenderness.  Pain
> on palpation over the iliolumbar ligaments at the medial
> aspect of the iliac crest.  Straight leg raise and slump
> test cause only back pain but no radiating leg pain.
> Manual muscle testing is 5/5 for proximal and distal
> muscle groups.  Reflexes are 2+ at the knees and
> ankles.  Sensation is intact to light touch.  Pulses are
> palpable, range of motion in the lower extremities is full
> and there is no swelling of the lower extremities.  Gait
> and station, unremarkable.  Range of motion of the
> lumbar spine is painful and limited at the end-range of
> both flexion and extension.  Range of motion of the hips,
> knees, and ankles is within normal limits.[5]

[Dkt. 23-4, H180].

Dr. Norris concluded that Carroll "has largely recovered from the very

acute episode that she had, which almost certainly represented a subluxation of

---

[5] *See supra* note 1.

the SI joint." [Dkt. 23-4, H180]. Norris referred her to Dr. DeMaggio for the possibility of sacroiliac radiofrequency procedure, gave her a note to return to work, and also renewed her Oxycontin prescription. [Dkt. 23-4, H180-H181].

On April 10, 2009 Dr. Norris reported Carroll's back pain was "moderate to severe" and "more or less continuous, it is aggravated with sitting at work and with bending and is eased with rest and the use of the SI compression brace. It is more or less localized to the low back with some radiation into the left leg." [Dkt. 23-4, H179]. Dr. Norris noted that he had referred Carroll to DeMaggio because she had "had two episodes of very severe pain from SI instability" and further reported Carroll's pain as "severe sacroiliac pain." [Dkt. 23-4, H179]. Norris stated that "[s]he is not doing well with having increased her work hours to six hours three days a week. I have given her a note to have her drop her work hours back down to four hours three days a week on in [sic] an indefinite basis until we can get her in to see Dr. DeMaggio [for sacroiliac radiofrequency]." [Dkt. 23-4, H179]. Upon physical examination, Dr. Norris reported the following:

> The patient has severe pain on palpation and stress testing over the left sacroiliac joints and positive SI stress testing. Minimal sciatic notch tenderness. Pain on palpation over the iliolumbar ligaments at the medial aspect of the iliac crest. Straight leg raise and slump test cause only back pain but no radiating leg pain. Manual muscle testing is 5/5 for proximal and distal muscle groups. Reflexes are 2+ at the knees and ankles. Sensation is intact to light touch. Pulses are palpable, range of motion in the lower extremities is full and there is no swelling of the lower extremities. Gait and station, unremarkable. Range of motion of the lumbar spine is painful and limited at the end-range of

20

> both flexion and extension.  Range of motion of the hips,
> knees, and ankles is within normal limits.[6]

[Dkt. 23-4, H179].

Carroll had radiofrequency lesioning of the SI joints on May 14, 2009 and received a bilateral sacro-iliac injection from Dr. Norris on June 25, 2009.  [Dkt 23-4, H178, H177].  On July 9, 2009 she returned to Dr. Norris for a follow up, and he reported that she had had "some improvement" with the radiofrequency lesioning procedure.  [Dkt 23-4, H177].  Dr. Norris reported that Carroll's pain was "moderate and intermittent whereas before it was severe and constant.  The right side only flares up occasionally . . . The pain is eased by pain medication. . . The pain is increased with bending and sitting and is localized to the lumbosacral junction."  [Dkt 23-4, H177].  Norris's impression was that Carroll "is not doing too badly overall.  The pain medication is keeping her symptoms under control and things are noticeably improved although clearly not completely resolved, following the radiofrequency lesioning.  This can be repeated as necessary."  [Dkt 23-4, H177].  Physical examination found the following:

> The patient has moderate pain on palpation and stress testing over the left sacroiliac joints and positive SI stress testing.  Minimal sciatic notch tenderness.  Pain on palpation over the iliolumbar ligaments at the medial aspect of the iliac crest.  Straight leg raise and slump test cause only back pain but no radiating leg pain.  Manual muscle testing is 5/5 for proximal and distal muscle groups.  Reflexes are 2+ at the knees and ankles.  Sensation is intact to light touch.  Pulses are palpable, range of motion in the lower extremities is full and there is no swelling of the lower extremities.  Gait and station, unremarkable.  Range of motion of the lumbar spine is painful

---

[6] *See supra* note 1.

21

> and limited at the end-range of both flexion and extension.
> Range of motion of the hips, knees, and ankles is within
> normal limits.[7]

[Dkt 23-4, H177]. Dr. Norris concluded that Carroll would continue with her

normal activities and would return on an as needed basis. [*Id.*]. As discussed

prior, on August 18, 2009 Dr. Norris again saw Carroll and noted that she "rates

her pain as mild to moderate, continuous, aggravated with bending, sitting and

walking, and eased by lying down and with pain medications." [Dkt. 23-4, H175].

Carroll also submitted medical records that post-dated the end of the

Elimination Period (August 9, 2009). Carroll saw Dr. Raymond Auletta of Pioneer

Spine and Sports Physicians for an initial visit on October 21, 2009 for a

consultation of lower back pain. [Dkt. 23-4, H172]. The examination note by Dr.

Auletta summarized Carroll's medical history and reported that Carroll "notes

that she had little if any benefit from radiofrequency procedures" and worsened

pain after a second radiofrequency procedure with Dr. DeMaggio. [*Id.*]. Auletta

also reported that Carroll had undergone an MRI in February 2008 which revealed

disc herniation; a followup MRI [presumably the February 2009 MRI] "showed a

similar disc herniation, perhaps slightly smaller." [Dkt. 23-4, H172]. He noted that

Carroll "denies radicular pain involving the lower extremities still notes persistent

back pain. The pain is worse with prolonged sitting, and with prolonged standing

or ambulating." [Dkt. 23-4, H172]. Upon examination, Dr. Auletta reported that

Carroll "walks with a markedly antalgic gait, walks with a labored and slow gait."

[Dkt. 23-4, H173]. The physical exam further revealed

---

[7] *See supra* note 1.

> **Mild tenderness of the left posterior superior iliac spine. Moderate tenderness of the right posterior superior iliac spine.  Mild tenderness at the greater trochanter bilaterally, moderate tenderness of the iliolumbar ligament bilaterally, lumbar paraspinal area, but no tenderness of the piriformis, sciatic notch, SI joint or trochanteric bursa bilaterally.  Patient has normal posture.**

[Dkt. 23-4, H173].  Auletta concluded that Carroll "clearly has had an L5-S1 disc herniation to the right which seems to correspond well with her current symptoms.  When she does not take her Neurontin she describes symptoms in what appears to be in the L5 dermatome."  [Dkt. 23-4, H172].  Dr. Auletta planned for Carroll to undergo a right L5-S1 transforminal epidural injection because she had not had one previously and it "should be the next reasonable [sic] planned for her."  [Dkt. 23-4, H174].  If the injection failed, Auletta reported that Carroll would be a candidate for land-based and then aquatic-based physical therapy and then, if her symptoms had not improved, a candidate for "surgical reconsultation."  [Dkt. 23-4, H174].  He lastly concluded that Carroll "does appear to have radicular lower extremity symptoms on the right with a disc herniation that corresponds."  [*Id.*].  Carroll received the L5-S1 transforminal epidural injection from Dr. Auletta on October 29, 2009.  [Dkt. 23-4, H171].

At a follow up appointment on November 11, 2009 with Dr. Auletta, the doctor noted that Carroll was "feeling about the same compared to last visit.  Epidural injection that was performed has not helped.  Radiates to the right buttock and posterior aspect of the right thigh.   Radiates to the posterior and lateral aspect of the right leg," although Auletta also observed that Carroll "walks

with a normal gait," "appears more comfortable today, and is ambulating more smoothly."  [Dkt. 23-4, H170].

Carroll had a Lumbar Spine MRI on November 15, 2009.  The MRI report notes "chronic disc space narrowing and a right paramedian disc protrusion which is grossly stable in size" at the L5-S1 level.  [Dkt. 23-4, H162].  This "chronic small right paramedian disc protrusion" demonstrated that there had been "[n]o appreciable interval change from [Carroll's MRI]" on February 14, 2009.  Further, the report stated that "no new lumbar lesions of significance are detected."  [Dkt. 23-4, H160-H161].  Dr. Charles Mick reviewed this MRI scan on November 18, 2009 and noted "persistent narrowing of the L5-S1 disc space with a focal right-sided L5-S1 disc herniation which is about the same size on both MRI scans."  [Dkt. 23-4, H162].  His noted treatment plan states: "[a] review of the patient's chart demonstrates persistent symptoms for several months and if these are intolerable the patient may be a candidate for surgical intervention." [Dkt. 23-4, H162].

Dr. Auletta saw Carroll on December 2, 2009.  He noted that Carroll was "feeling about the same compared to last visit [on November 11, 2009]," and that the "epidural injection that was performed has not helped."  [Dkt. 23-4, H166]. Carroll's pain "radiates to the right buttock and posterior aspect of the right thigh.  Radiates to the posterior and lateral aspect of the right leg."  [*Id.*]  Auletta concluded that Carroll appeared to be a surgical candidate "as she has failed conservative treatment."  [Dkt. 23-4, H166].  He further reported that Carroll "walks with a normal gait" and "appears more comfortable today, and is

ambulating more smoothly." [Dkt. 23-4, H167].  Auletta also reported that Carroll

had been referred to Dr. Charles Mick to consider surgical treatment options.

[*Id.*].

Carroll saw Dr. Mick on January 21, 2010 for further evaluation of her lower

back pain.  [Dkt. 23-4, H164-H165].  Dr. Mick reported her medical history as

follows:

> Since 1981 the patient has experienced low back pain
> off-and-on.  Gradually over the years her symptoms
> have worsened.  She has been treated with multiple
> attempts at medication management, physical therapy
> focusing on exercises and has undergone numerous
> cortisone injections into the lower back and sacroiliac
> joint region.  She has also undergone to [sic]
> radiofrequency denervation's [sic] of the lower back and
> sacroiliac joint region without prolonged benefit.  95% of
> her pain is located in the lower back and about 5%
> radiates into the hips and occasionally down the right
> leg.  The patient is finding it increasingly difficult to do
> her daily activities and has been unable to work because
> of the pain for at least 6 months.

[Dkt. 23-4, H164].  Dr. Mick noted as to Carroll's "Functional Status" that "an

Oswestry pain questionnaire was completed and reviewed today" but he provided

no further information about the questionnaire in his notations.  [*Id.*].  A physical

exam revealed that

> The patient moves slowly and cautiously trying to avoid
> most old movements of the lower back.  Flexion is
> severely limited with only about 10-20° at the waist.
> Lateral bending is moderately limited as is extension.
> Straight leg raising is negative to 80° bilaterally.  The
> hips move well.  The vascular exam is intact.
> Neurological testing shows normal motor strength in all
> muscle groups.  Patella and Achilles reflexes were 2+
> and symmetric.  Sensation is decreased in the right
> lateral foot.

[Dkt. 23-4, H164]

Dr. Mick discussed with Carroll her surgical options.  [Dkt. 23-4, H165].  He also noted that Carroll has "pursued multiple modalities of conservative treatment over the years with decreasing success, increasing pain and increasing limitations. . . His [sic] undergone numerous injections and currently requires narcotic pain medication to function without good pain relief."  [Dkt. 23-4, H165].

Dr. Mick wrote a letter to Carroll's attorney on April 22, 2010 In support of Carroll's appeal of her LTD benefits denial. The letter summarized Carroll's reported medical history and condition prior to her anticipated surgery. [Dkt. 23-4, H152].  He noted that "[i]n approximately June of 2009 [Carroll's] pain became too severe to continue to perform her job as an office worker which required prolonged sitting in a chair."  He continued that:

> Since the summer of 2009 the patient has been significantly limited.  She is unable to lift more than 10 pounds.  Sitting and standing are limited to 15-30 minutes after which she must change positions. . . . Due to the patient's limited sitting ability she is unable, and has been unable since the summer of 2009, to perform sedentary office work.  The patient must rest frequently during the day when her pain level reaches an intolerable level and is unable to sustain an 8 hour workday.  She is unable to do repetitive bending.  The recovery following surgery is anticipated to take 6-12 months before maximum medical improvement will be obtained.

[Dkt. 23-4, H152].  Lastly, he noted that Carroll was scheduled to undergo spinal reconstructive surgery with an L5-S1 fusion and decompression on May 11, 2010. [*Id.*].

Carroll also provided upon appeal a Notice of Award of SSDI benefits, dated January 12, 2010, which concluded that Carroll had become disabled on July 24, 2009 and that she was entitled to benefits beginning in January 2010.  It included no information about the medical evidence provided in support of the application or the rationale for the decision or the disability onset date.  [Dkt. 23-4, H157-H159].

On June 1, 2010 Judith Rose, the Appeal Specialist assigned to Carroll's appeal, made a lengthy notation in Carroll's file summarizing Carroll's medical records, the denial of her claim, and the Hartford's conclusions to date.  [Dkt. 23-3, H90-H94].  Rose reported, in pertinent part, as follows:

> A review of the [employee]'s LTD claim file shows that no consideration was made of [employee]'s report that she had been referred to Dr. Raymond Auletta, a new physician, for further treatment, that she had undergone a 2nd radio frequency test, which showed no improvement or that she was scheduled for another epidural injection on 10/29/09.  This information suggests that [employee]'s condition was not yet stable as of 10/26/09 and, as such, the additional procedures should have been investigated prior to denying her claim.[8]
>
> …
> Att[orne]y notes in her May 6, 2010 appeal letter that [employee] is actually scheduled for an L5-S1 fusion on May 11, 2010, certainly supporting the fact that [employee]'s condition has not reached a state of stability.

[Dkt. 23-3, H93].  Rose documented the plan for Carroll's claim as follows:

---

[8] Hartford denied Carroll's claim on November 17, 2009.

> **LTD [analyst] did not consider [employee]'s 10/26/09 information when making the claims decision.  It is likely that this information would have supported [employee]'s [claim of] continued problems with her previously reported symptoms and, as Dr. Auletta's notes [provided with Carroll's appeal] show, these symptoms did not improve, but worsened to the point where [employee] needed a fusion and decompression. . . At this point, it is unclear why the claim was terminated despite [employee]'s phone call three days prior in which she reported treatment continuing and her being referred to another physician for further evaluation. Determining now if file should be returned to claims office for further review of medical information as it is clear that [employee]'s condition, for which we paid her through STD, had not improved as of the date her claim was denied.  Will make that decision shortly.**

**[Dkt. 23-3, H93].**

Hartford determined shortly thereafter – in June, 2010 – that a medical record review of Carroll's file was appropriate.  [Dkt. 23-3, H90].  An October 26, 2009 notation in Carroll's Hartford file notes that Carroll "called to advised [sic] that she went for a 2nd radio frequency test it showed no improvement.  She was referred to a new MD @ Pioneer Sports Medicine [ ] Dr. Allutta [sic].  [Employee] has been scheduled for a [sic] epidural injection on 10/29/09.  [Employee] just wanted us to be aware of the current status of her medical condition."  [Dkt. 23-3, H97].

In July 2010, Hartford obtained a medical record review by E. Franklin Livingstone, MD, board certified in Physical Medicine and Rehabilitation, who then provided a Peer Review Report.  [Dkt. 23-3, H133-H138].  Dr. Livingstone reviewed all records provided by Hartford, including the two MRIs (February 14,

**28**

2009 and November 15, 2009) as well as the medical records from the offices of Dr. Andrew DeMaggio, Dr. Richard Norris, and Pioneer Spine and Sports Physicians.  In addition, he spoke by telephone with Drs. DeMaggio, Norris, and Mick.  [Dkt. 23-3, H133-H137].  In his summary of Dr. Norris' records, Dr. Livingstone noted that Norris' office visit documentation "indicated moderate pain on palpation" and that the "physical examination portion of the other office notes is fairly consistent without other objective physical findings."  Livingstone also noted Dr. Norris' inability during Carroll's initial claim to report the number of hours he believed Carroll to be capable of sitting, standing, or walking.  [Dkt. 23-3, H135].

Dr. Livingstone spoke briefly with Dr. DeMaggio on July 2, 2010, who reported that he had last seen Carroll on September 17, 2009, and that "he had no opinions relative to her functionality because of the fact that he has had no recent contact with her." [Dkt. 23-3, H134].  Dr. Norris reported to Dr. Livingstone when they spoke on June 29, 2010 that he had last seen Carroll on October 2, 2009, that she had failed to respond to pain management, and that she had been transferred to Dr. Auletta [of Pioneer Spine and Sports Medicine].  [Dkt. 23-3, H135].  Norris indicated to Livingstone that "there were no were no cognitive problems and that there were no problems with adverse side effects from current medications" and that current treatment included "primarily pain management with medication adjustments."  [Dkt. 23-3, H135-H136].  Livingstone asked Norris if, in his opinion, Carroll was physically capable of sedentary level work activities and Norris

responded that it was "hard to answer, that she could work up to 20 hours per week but would need a sit/stand table."  [Dkt. 23-3, H136].

Dr. Livingstone also spoke with Dr. Mick on June 29, and Dr. Mick reported that Carroll's last office visit with him had been on June 2, 2010 for a postoperative follow-up and that Carroll was "coming along nicely."  [Dkt. 23-3, H137].  Livingstone reports that Mick said "that she was able to sit, stand, and walk in his office without qualifications," that "there were no problems related to cognitive function and no problems with side effects from current medications," and that "she would be able to return to sedentary or light duty work activities full-time, 4-6 months postoperatively, which would be sometime between 9/11/10 and 11/11/10."  [Dkt. 23-3, H137].

Dr. Livingstone's conclusions as to Carroll's functional capacity from February 9, 2009 and ongoing were as follows:

> Between 2/9/09 and 5/11/10, Ms. Carroll was minimally physically capable of sedentary level work activities on a full-time basis with the proviso of frequent position changes and simple stretching at workstation every 20 minutes to prevent the development and progression of stiffness and pain.  She was able to lift, carry, and push and pull up to 10 pounds of force occasionally and she could reach at waist level and above frequently, but below waist level only occasionally, and she could finger, feel, handle, and keyboard continuously.  She could drive occasionally, crouch, crawl, kneel, and stoop occasionally, but could bend at the waist only rarely.

[Dkt. 23-3, H138].

30

Summarizing Dr. Mick's opinion, Dr. Livingstone stated that Carroll could return to work 4-6 months post lumbosacral decompression and fusion, which would be sometime between September 11, 2010 and November 11, 2010. [*Id.*]  He concluded that "[a]t that point, she should be appropriate for sedentary or light level activities without further restrictions."  [*Id.*].

Hartford notified Carroll's attorney by letter dated July 15, 2010 that it was upholding its prior denial of LTD benefits "because the medical and vocational information in the claim file did not substantiate Ms. Carroll satisfied the definition of disability set forth in the Policy."  [Dkt. 23-3, H129-H132].  The letter summarized the medical records Carroll had submitted with her initial claim for LTD benefits and the peer review by Dr. Brenman, who concluded that "while Ms. Carroll would have some lifting and carrying restrictions based on her lumbar and joint dysfunction [as diagnosed by Dr. Norris], she remained capable of performing up to light physical demand level work."  [Dkt. 23-3, H130].  The letter reiterated that "based upon her employer's report of her occupational demands and relying upon medical information made available for review in this claim, Ms. Carroll's [initial] claim for [LTD] Income benefits was denied on the basis that she remained capable of performing her own occupation as an Accounts Receivable Clerk."  [Dkt. 23-3, H130].

The letter then summarized Dr. Livingstone's findings on appeal, reiterating that Dr. DeMaggio had provided no opinions on Carroll's functionality, Dr. Norris had told him that Carroll had some physical examination findings but no cognitive impairment or medication side effect problems and "could work twenty

hours per week in sedentary occupation but would need a sit/stand table," and that Dr. Mick had reported that Carroll "was coming along nicely" post-surgery and would be able to return to work on a full-time basis at sedentary to light duties four to six weeks post-surgery. [Dkt. 23-3, H130-H131]. The letter also summarized the relevant medical findings in the medical notes and reports of Drs. Mick and Auletta. [Dkt. 23-3, H131]. The letter then quoted the conclusions that Dr. Livingstone had provided in his report that Carroll was, from February 9, 2009 to May 11, 2010, "minimally physically capable of sedentary level work activities on a full-time basis with the proviso of frequent position changes and simple stretching at workstation every 20 minutes . . ." (entirety quoted above). [Dkt. 23-3, H131].

Hartford found that "Carroll's occupation as an Accounts Receivable Clerk is performed at a sedentary physical demand level in the general workplace. Therefore, based on Dr. Livingtstone's conclusions, it is reasonable that Ms. Carroll remained capable of continuing her own occupational job duties up to the date she underwent surgery on May 11, 2010. As such, the denial of Ms. Carroll's claim was appropriate." [Dkt. 23-3, H132]. Hartford further explained that

> Based upon the provisions of the Policy, benefit payment for Disability requires a finding that you are prevented by injury or sickness from performing the essential duties of your occupation. The medical information made available for review, in its totality, does not corroborate Ms. Carroll's report of limitations in function preventing her from performing her occupational activities. Our assessment of the information provided by her physicians has been confirmed by means of review of her records with a

variety of specialties, including the assessment of a
previous independent physician, and a review obtained
specifically in the course of this appeal.

[Dkt. 23-3, H132].

Finally, Hartford concluded that

[a]lthough the documentation does support that Ms.
Carroll is diagnosed with medical conditions, and did
eventually undergo back surgery on May 11, 2010, the
record, as detailed in this letter, does not corroborate
that she satisfies the policy definition of Disability as of
her date of loss on February 9, 2009 and ongoing until
May 11, 2010 and, as such, we must maintain the initial
claim decision to deny Ms. Carroll's request for LTD
benefits.

[Dkt. 23-3, H132].

## III.   Legal Standard

"When an ERISA plan participant challenges a denial of benefits, the
proper standard of review is de novo 'unless the benefit plan gives the
administrator or fiduciary discretionary authority' to assess a participant's
eligibility." *Thurber v. Aetna Life Ins. Co.*, 12-370-CV, 2013 WL 950704, at *3 (2d
Cir. Mar. 13, 2013) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115
(1989)).  "If the plan does reserve discretion, the denial is subject to arbitrary and
capricious review and will be overturned only if it is without reason, unsupported
by substantial evidence or erroneous as a matter of law." *Thurber*, 2013 WL
950704, at *3 (internal citations and quotation marks omitted); *see also McCauley
v. First Unum Life Ins. Co.*, 551 F.3d 126, 131 (2d Cir. 2008).  "Substantial evidence

33

is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [Plan Administrator] ... and requires more than a scintilla but less than a preponderance."  *Levitian v. Sun Life & Health Ins. Co.*, 486 F. App'x 136, 139 (2d Cir. 2012) (internal quotation marks and citations omitted).  This scope of review is narrow and the Court is not permitted to substitute its own judgment for that of the decision maker.  *Alto v. Hartford Life Ins. Co.*, 485 F. App'x 482, 483 (2d Cir. 2012); *Burgio v. Prudential Ins. Co. of Am.*, 06-CV-6793 JS AKT, 2011 WL 4532482 (E.D.N.Y. Sept. 26, 2011) (citing *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)).  "In reviewing the administrator's decision deferentially, a district court must consider whether the decision was based on a consideration of the relevant factors."  *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995).

Here, the Policy states that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy."  [Dkt. 23-2, H44; Dkt. 23, D's 56(a)(1) Stmnt. ¶3].  The parties do not dispute that the Policy vests full discretion in Hartford, and so arbitrary and capricious review is proper.

In addition, where a plan administrator "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," a conflict of interest exists and a court "should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  "[T]he significance of the factor will depend upon the circumstances of the particular

case."  *Id.*  The Supreme Court has declined to apply a general rule for analysis of such a conflict, instead opining that "conflicts are but one factor among many that a reviewing judge must take into account" and that "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance."  *Id.* at 117.  Further, "where circumstances suggest a higher likelihood that [the conflict] affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration," a court should weigh the conflict more heavily.  *Id.* *See also McCauley*, 551 F.3d at 133 ("a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make de novo review appropriate.  This is true even where the plaintiff shows that the conflict of interest affected the choice of a reasonable interpretation.").

## IV.   Discussion

Carroll argues that her persistent lower back pain rendered her disabled within the meanings of the Policy for purposes of LTD benefits during the Elimination Period and beyond.  She further argues that Hartford's conflict of interest should be weighed heavily, as should its reliance on what Carroll deems to be biased vendors of medical services, and that Hartford failed to consider the grant of Social Security Disability insurance benefits in her favor.  Hartford counters that the medical evidence supports denial of Carroll's claim and that no

conflict exists based on any perceived bias of the medical vendors it uses to assist it in determining the merits of benefits claims.  The Court will examine the circumstances of Carroll's benefits denial and the parties' arguments in turn.

   a.  <u>Hartford's denial of Carroll's claim is supported by substantial medical evidence</u>

As noted above, the parties here agree that the Elimination Period ran from February 9, 2009 to August 9, 2009.  [Dkt. 23, D's 56(a)(1) Stmnt. ¶12].  Pursuant to the Policy, Carroll was entitled to LTD benefits if she 1) became disabled while insured under the Policy, 2) was "Disabled throughout the Elimination Period," 3) remained disabled beyond the Elimination Period, and 4) submitted proof of loss to Hartford.  [Dkt. 23-2, H37].  The Policy defines Disability for purposes of LTD benefits as being "prevented from performing one or more of the Essential Duties of: 1) Your Occupation during the Elimination Period; 2) Your Occupation, for the 2 year(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and 3) after that, Any Occupation."  [Dkt. 23-2, H45; Dkt. 23, D's 56(a)(1) Stmnt. ¶4].  The Policy states that the "ability to work the number of hours in Your regularly scheduled work week is an Essential Duty."  [Dkt. 23-2, H46; Dkt. 23, D's 56(a)(1) Stmnt. ¶6].

   i.  <u>Initial Denial</u>

Carroll argues that she was unable during the Elimination Period to work the number of hours required for her full-time position.  Hartford concluded in its

36

denial of Carroll's *initial claim* for LTD benefits that Carroll was not disabled under the Policy during the Elimination Period, based both upon the lack of evidence of radiculopathy in the record and based on Dr. Brenman's determination that Carroll could work forty hours per week and not twenty as Dr. Norris eventually concluded after first stating that it was variable and that he could not say.  A review of the evidence in the administrative record reveals that Hartford's determination that Carroll did not provide sufficient evidence that she was incapable of working full-time during the Elimination Period is supported by substantial evidence.

Dr. Norris noted in his Attending Physician's Statement on August 18, 2009 that Carroll could sit, stand, or walk for thirty minutes at a time, and reported that the hours per day that she could perform these activities were "variable – not predictable."  When Hartford asked for clarification of how many hours total per day Dr. Norris thought that Carroll could perform these functions, Dr. Norris initially refused to provide an estimate, instead responding that the hours per day were "UNKNOWN" and further that "OBVIOUSLY, I cannot observe her for 8 hrs, to determine this.  ALL I CAN DO IS <u>ASK</u> MS. CARROLL FOR HER ESTIMATE." When Hartford requested clarification of Carroll's functions from Dr. DeMaggio, his office responded that "We do not fill out functional capacity forms" and instead sent a September 17, 2009 treatment note that contained no analysis of Carroll's capacity to sit, stand, or walk.   During Dr. Ephraim Brenman's independent review of the medical records, Dr. Norris clarified in conversation with Brenman that Carroll's functional capacity was "best answered by an FCE

[functional capacity examination]" and that she "can work 20 hours a week with accommodations, and using a sit-to-stand table.  The claimant has a sit-down job."  Dr. Norris neither performed the functional capacity test or any other objective diagnostic tests; instead, his answer indicates that he based his opinions on Carroll's subjective views of how many hours per week she could work.

Further, Carroll consistently reported her pain levels as mild to moderate in her initial claim for benefits, with few exceptions, after her initial acute episode in February.  On June 5, 2009, Glenda Boykin, P.A. noted that Carroll rated her pain a "3/10 in severity," that she felt "the same overall," and that she had "intermittent, achy pain in her lower back" and occasional "radicular pain in her left leg."  She complained at that visit of "moderate discomfort on palpation over the upper poles of each buttock" and "some mild discomfort on palpation over the spinous processes of her lumbar spine."  Dr. Norris noted that Carroll rated her pain as mild to moderate on August 18, 2009, with "moderate pain on palpation and stress testing," and that Carroll had reported the pain to be "mostly localized to the lumbosacral area" and "mild to moderate, continuous, aggravated with bending, sitting, and walking, and eased by lying down and with pain medications."  Dr. DeMaggio noted on September 17, 2009 that Carroll had "responded in a positive manner to previously performed diagnostic and therapeutic blocks" and further stated that it was his "intention to perform a longer lasting, perhaps permanent radiofrequency lesioning procedure to these involved structures."  It was not arbitrary and capricious for Hartford to determine

38

based on these reports that Carroll's pain level did not preclude her from working full-time, or even that her condition had shown some improvement.

Moreover, there is substantial evidence in this initial determination record to conclude that Hartford's determination that Carroll did not have a true radiculopathy was not arbitrary or capricious.  Glenda Boykin noted on June 5, 2009 that Carroll, upon examination, "denies any radicular pain with range of motion of her lumbar spine," but that she reported occasional "radicular pain in her left leg."  In his August 18, 2009 Attending Physician's Statement, Dr. Norris listed Carroll's primary diagnosis as sacro-iliac pain and her secondary diagnosis as lumbar disk herniation.  He did not include radiculopathy in his diagnosis.  On August 18, 2009 Dr. Norris reported upon physical examination that "[s]traight leg raise and slump test cause only back pain *but no radiating leg pain*" and further noted that Carroll reported pain "mostly localized to the lumbosacral area."  In Dr. DeMaggio's September 17, 2009 treatment note, DeMaggio noted Carroll's "somewhat atypical radiculopathic lower extremity symptoms."

Based upon the totality of the information contained in the records in support of her initial claim for LTD benefits, Hartford's determination of denial was not arbitrary or capricious.  In fact, Dr. Brenman's independent opinion upon review of these records is not inconsistent with Dr. Norris' estimates that the hours per day that Carroll could sit, stand, or walk were "variable – not predictable" and "UNKNOWN."  Based on Dr. Norris' inability or unwillingness to clarify Carroll's restrictions and limitations or to state outright that she could not work full-time, plus the lack of evidence of radiculopathy in the record, it was not

**39**

arbitrary and capricious for Hartford to conclude that, in fact, Carroll *could* work full-time, thereby precluding her from being disabled under the meaning of the Policy.  Even crediting Dr. Norris' later statement that Carroll could "work 20 hours a week with accommodations, and using a sit-to-stand table," Hartford's determination was not arbitrary or capricious.  There is no evidence in the record that Norris provided any explanation or rationale for his assertion that Carroll could work twenty hours per week, nor did Norris specifically restrict Carroll's work hours to *only* twenty per week.  If Carroll was able to work full-time during the Elimination Period, she was thus unable to prove that she was disabled *throughout* the Elimination Period.

### ii.   Determination on Appeal

Likewise, Hartford's determination on July 15, 2010 that it was upholding denial of Carroll's claim based on its determination that Carroll "remained capable of performing up to light physical demand level work" and remained "minimally physically capable of sedentary level work activities on a full-time basis with the proviso of frequent position changes and simple stretching at a workstation every 20 minutes" was not arbitrary or capricious.  As previously noted, Carroll was able to and did provide additional information relating to her claim on appeal, and Hartford's review on appeal necessarily considered all such information.  Hartford's determination that Carroll's additional medical documentation, though, failed to support her claim in the same general ways as the information she supplied for initial review was not arbitrary and capricious as it was supported by substantial evidence in the appeal record.

**40**

After her acute and severe incident on February 9, 2009, the evidence suggests that Carroll's pain levels remained mostly constant at moderate levels, with one episode of severe pain in April.  Dr. Norris performed four physical exams on Carroll in February, April, July, and August 2009, and his physical findings at each exam were exactly the same, save for Carroll's pain levels on palpation:

> The patient has [usually moderate] pain on palpation and stress testing over the left sacroiliac joints and positive SI stress testing.  Minimal sciatic notch tenderness.  Pain on palpation over the iliolumbar ligaments at the medial aspect of the iliac crest.  Straight leg raise and slump test cause only back pain but no radiating leg pain.  Manual muscle testing is 5/5 for proximal and distal muscle groups.  Reflexes are 2+ at the knees and ankles.  Sensation is intact to light touch.  Pulses are palpable, range of motion in the lower extremities is full and there is no swelling of the lower extremities.  Gait and station, unremarkable.  Range of motion of the lumbar spine is painful and limited at the end-range of both flexion and extension.  Range of motion of the hips, knees, and ankles is within normal limits.

On February 26, 2008 Carroll's pain on palpation was moderate; on April 10, 2009, her pain on palpation was severe; on July 9 it was moderate; and on August 18, 2009 it was moderate.  On each of these dates Norris noted that Carroll had *minimal* sciatic notch tenderness, no radiating leg pain, full range of motion in the lower extremities, and unremarkable gait and station.  On February 26 Norris noted that Carroll had "largely recovered from the very acute episode that she had."  On July 9, after the recurrence of Carroll's severe pain in April, Norris reported that she had had "some improvement" after a radiofrequency lesioning procedure and that Carroll's pain was "moderate and intermittent whereas before

it was severe and constant.  The right side only flares up occasionally . . . The pain is eased by pain medication. . . The pain is increased with bending and sitting and is localized to the lumbosacral junction."  He also noted that Carroll was "not doing too badly overall.  The pain medication is keeping her symptoms under control and things are noticeably improved although clearly not completely resolved, following the radiofrequency lesioning," which Norris advised repeating as necessary.  As noted prior, on August 18, 2009 Dr. Norris noted that Carroll "rates her pain as mild to moderate, continuous, aggravated with bending, sitting and walking, and eased by lying down and with pain medications."  Dr. Livingstone, who reviewed each of Norris' examination reports, noted in his peer review report that Norris' office notes "indicated moderate pain on palpation" and that the "physical examination portion of the other office notes is fairly consistent without other objective physical findings."  Also as noted prior, Carroll had reported her pain as a 3 on a scale of 10 during her visit with Glenda Boykin, P.A. on June 5, 2009.  Further, Carroll's MRI report from February 2009 indicated that Carroll's physical condition had not changed from February 2008 and, perhaps, had slightly improved, and her MRI from November 15, 2009 showed no changes; Dr. Livingstone noted such in his peer review report.

In October 2009 Dr. Auletta examined Carroll and noted that she reported persistent back pain, but upon examination Auletta reported only mild or moderate tenderness at the left posterior superior iliac spine and greater trochanter bilaterally, iliolumbar ligament bilaterally, and lumbar paraspinal area, and no tenderness of the piriformis, sciatic notch, SI joint or trochanteric bursa

bilaterally.  Auletta planned to give Carroll an injection she had previously never received and, if that failed, to refer her as a candidate for physical therapy and then surgical reconsultation.  On November 11, 2009, after this injection, Auletta noted that Carroll was "feeling about the same compared to last visit" but also that she "appears more comfortable today, and is ambulating more smoothly," notations he repeated for Carroll's December 2, 2009 visit.  On January 21, 2010 Dr. Mick noted that "an Oswestry pain questionnaire was completed and reviewed today" but he provided no further information about the questionnaire or its results in his notations.  Dr. Livingstone noted the above findings in his peer report upon Carroll's appeal.

As part of his independent medical records review in June and July, 2010, Dr. E. Franklin Livingstone contacted Drs. DeMaggio, Norris, and Mick.  Dr. DeMaggio offered no opinions on Carroll's functionality because he had had no recent contact with her.  Dr. Norris reported that he had last seen Carroll approximately eight months prior, and that "there were no cognitive problems and that there were no problems with adverse side effects from current medications" and that Carroll's current treatment included "primarily pain management with medication adjustments."  Norris stated that it was "hard to answer" if Carroll was physically capable of sedentary level work activities and, without explanation, that Carroll could work up to 20 hours per week with a sit/stand table.  Dr. Mick reported that Carroll was "coming along nicely" post spinal surgery, which was performed in May 2010, and that she could return to work four to six months post-operatively.

Based upon the totality of the information contained in the records in support of Carroll's appeal, Hartford's determination of denial was not arbitrary or capricious.  Dr. Livingstone's independent peer report concluded that, based on the totality of the medical records, between February 9, 2009 and May 11, 2010, Carroll was "minimally physically capable of sedentary level work activities on a full-time basis with the proviso of frequent position changes and simple stretching at workstation every 20 minutes."  Carroll's pain levels and physical examinations as presented in the medical records, as noted above and as noted by Dr. Livingstone in his report, provide substantial evidence for Hartford's determination that Carroll had been minimally capable of working full-time. Further, like Dr. Brenman's earlier Peer Review Report, Dr. Livingstone's report was not inconsistent with the findings of Carroll's treating physicians, based on the medical records available and the physicians' statements to Livingstone. Although Dr. Norris ultimately stated that Carroll could work twenty hours per week with a sit/stand desk, he did not expressly deny that she could work more than twenty hours per week and indicated that it was "hard to answer" if Carroll was physically capable of full time sedentary level work activities.  Norris did not base his opinion on a physical exam of the Plaintiff, objective diagnostic testing or, apparently, on any independent medical judgment; rather, he based his opinion of Carroll's functional capacity on reports from Carroll herself.  Again, there is no evidence in the record on appeal that Dr. Norris provided any explanation or rationale for his assertion that Carroll could work twenty hours per week.  It was not, then, arbitrary or capricious for Hartford to conclude that based

on the physical examination findings in her record Carroll could work full-time, or that Carroll's condition had not deteriorated between February and July 2009.

To the extent that Hartford credited the opinions of Drs. Brenman and Livingstone more highly than those of Carroll's treating physicians, the Court notes that Hartford did not abuse its discretion in doing so.  "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.  But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (vacating and remanding appellate court's reversal based on "treating physician rule" of district court's grant of summary judgment in favor of plan in plaintiff's denial of disability benefit claim).  *See also Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006) ("the Supreme Court has explicitly stated that, unlike the [Social Security Administration], ERISA Plan administrators need not give special deference to a claimant's treating physician.").  Based on the evidence provided in both Carroll's initial and appellate claims as detailed above, it was not arbitrary and capricious for Hartford to credit more highly the independent medical opinions of two separate experts in physical medicine, both of whom posited similar opinions as to Carroll's restrictions and limitations and that also conflicted with those of Dr. Norris.

Carroll's contentions that Hartford and Drs. Brenman and Livingstone disregarded her subjective complaints of pain are also unfounded.  As discussed, Drs. Brenman and Livingstone specifically noted the pain levels Carroll reported to her physicians and also noted the pain levels produced by physical examinations.[9]  As stated above she largely reported mild to moderate pain levels, save for the acute episode she suffered in April 2009. Likewise, there is no indication in the record that Hartford failed to consider her reports of pain.  That the independent record review reports *disagreed* with Carroll's subjective reports of her pain levels and with her doctors' reports of her pain levels is not dispositive.  The Second Circuit has noted that "[i]t has long been the law of this Circuit that the subjective element of pain is an important factor to be considered in determining disability."  *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001); *see also Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 88 (2d Cir. 2009) (noting same).  The Second Circuit has also held, though, that "it is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability."  *Hobson*, 574 F.3d at 88. Hartford did not dispute that Carroll had a back condition or that the condition caused pain.  As discussed above, although Carroll reported that her pain was

---

[9] For example, Brenman concluded that Carroll did not have radicular pain and that her "main pain is from the SI joint pain/dysfunction."  Dr. Livingstone, as noted, recounted the medical reports of Carroll's various physicians – including their reports of her pain – and ultimately concluded that she could work full time "with the proviso of frequent position changes and simple stretching at workstation every 20 minutes *to prevent the development and progression of stiffness and pain.*" (emphasis added).

debilitating, Carroll's physical examinations show mostly mild and moderate pain.  Further, although Carroll claims that not one of her physicians ever expressed doubt at the veracity of her claims of pain, Dr. Auletta noted on two separate occasions that, although Carroll reported that the epidural injection performed by him had not helped and she was "feeling about the same compared to last visit," Carroll "appears more comfortable today, and is ambulating more smoothly."  Additionally, Plaintiff's claim in her motion for summary judgment that "the defining feature of [her] disability is the constant unremitting pain with which she has had to live since at least the spring of 2008" is inconsistent with the facts of this case as set forth above.  [Dkt. 26, P's MSJ Memo. p. 27].

In sum, Hartford's denial of LTD benefits was not arbitrary or capricious where the record does not support Plaintiff's contention that Hartford refused to credit her subjective reports of pain.  *See Maniatty v. Unumprovident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002) *aff'd*, 62 F. App'x 413 (2d Cir. 2003) ("the administrator, far from ignoring the reports of the treating physicians, heavily relied on the fact that none of them adduced any objective evidence of plaintiff's complaints.  In these circumstances, it was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator.").

Finally, Carroll's contention that Hartford's failure to order her to undergo an independent medical exam ("IME") or a functional capacity exam ("FCE")

47

renders the denial of benefits arbitrary and capricious is also without significant merit, as this factor does not outweigh the considerations discussed above. Hartford's Claims Manual (the "Manual") states that "Special clinical tools may be used when conducting a review of a disability claim including, but not limited to, an IME or a records review by an Independent Medical Examiner."  [Dkt. 27-1, CM2].  It further provides that "[w]hile there are situations when an IME may not be the preferred resource (e.g., when only past functionality is under review), an IME is the preferred resource when a claim investigation requires an independent medical opinion."  [*Id.*].  The Manual notes several instances in which an analyst "may find it necessary to request an IME," including where "limitations noted by the attending physician are inconsistent with diagnostic study results or medical records," or "to resolve conflicting opinions of the claimant's limitations as provide [sic] to us by the claimant's treating/examining physicians and our own medical staff."  [*Id.*].  Likewise, the Manual provides that Hartford "may find it preferable in some circumstances to arrange for" a FCE rather than an IME, especially where the claimant's "disability is musculoskeletal or subjective in nature," or where the claimant's "attending physician has indicated that an FCE was necessary in order for him to address the claimant's functional abilities." [Dkt. 27-1, p.3 of 14].

        Based on the Manual, a Hartford analyst would have possessed the discretion to refer Carroll for an independent medical examination.  However, by the express terms of the Manual, Hartford was not required to do so.  The Manual is permissive, not mandatory; it expressly states that special clinical tools *may* be

**48**

used when conducting a claim review, and an analyst *may* refer a claimant for an IME or a FCE when faced with certain situations.  However, a *preferred* method is not a *mandatory* method.  Furthermore, the Manual specifically notes that "an independent records review can be used for the same purposes as an IME."  [Dkt. 27-1, CM7].  The Court also notes that, upon the date of Carroll's appeal, she was scheduled for and imminently received spinal surgery.  The performance of an IME or a FCE for purposes of her appeal would thus have been unavailing, as any examination performed post-surgery would not have revealed whether Carroll had been disabled throughout the Elimination Period.

It was therefore within Hartford's discretion and not arbitrary or capricious to order a medical records review rather than an IME or a FCE, and this factor does not outweigh the substantial evidence discussed *supra* in the arbitrary and capricious analysis.

### b.  Hartford's Conflicts of Interest and Alleged History of Biased Claims Administration

Carroll contends that the Court must heavily weight Hartford's conflict(s) of interest in determining whether the denial of her claim was arbitrary and capricious.  In support, Carroll argues both that Hartford has an extensive history of biased claims administration and that the medical record review vendors it used in its initial determination and on Carroll's appeal, from which it obtained Dr. Brenman's and Dr. Livingstone's reports, were biased and the reports issued were entirely lacking in foundation.  The Court disagrees.

As noted, where a plan administrator "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," a conflict of interest exists and a court "should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). "[C]onflicts are but one factor among many that a reviewing judge must take into account;" "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id.* at 117. Here, Hartford both determines whether a claimant is eligible for disability benefits and pays the claims out of its own pocket.[10] Thus, an inherent conflict exists that this Court must consider.

There is no evidence in the record to suggest that Hartford was inappropriately influenced by its conflict of interest as plan administrator and payor, especially considering the substantial evidence enumerated above supporting the determination that Carroll could perform the essential functions of her sedentary job on a full-time basis during the Elimination Period, and coupled with her physicians' equivocal and nonresponsive statements as to her functional capacities.

Carroll further contends that MES and UDC, the medical record review vendors Hartford utilized to analyze Carroll's claim, are biased and produced

---

[10] The Court notes that Partners is listed as the "Plan Administrator" in the Policy. [Dkt. 23-2, Policy p.71, H80]. However, Hartford expressly reserved discretionary authority to interpret the terms of the Policy and to award benefits, and bears all economic costs associated with its determination of benefits. Thus, for purposes of this factor, the Court will consider Hartford to be the plan administrator.

unreliable reports.  Specifically, Carroll alleges that MES is "a vendor with whom

Hartford has a long and well established relationship," and Dr. Ephram Brenman,

who MES chose to review Carroll's initial benefits application, "has a history of

providing unreliable reports."  [Dkt. 26, P's MSJ Memo. p.19].  Carroll, however,

has provided absolutely no evidence of any long or well established relationship

between Hartford and MES.  Nor has Carroll provided any relevant evidence in

this case that speaks to Dr. Brenman's alleged history of providing unreliable

reports.  Carroll cites to anecdotal information devoid of any empirical or

statistical analysis.  Carroll's citations to random cases involving Hartford in and

of themselves, without  empirical or statistical analysis, do not establish a pattern

of bias on the part of MES, UDC, or Dr. Brenman from which the Court could

conclude that they were biased in this case.  This Court may not base its decision

on evidence of abuses presented to other judges in other cases.  *See Couture v.*

*UNUM Provident Corp.*, 315 F. Supp. 2d 418, 428 (S.D.N.Y. 2004) ("my review of

the case cannot be based on allegations of past abuses made in lawsuits that are

not before me.  I must look to the record, and after extensive and searching

review, I conclude that there is insufficient evidence that either the doctors

[reviewing claims and employed by UNUM] or UNUM itself was acting under a

conflict of interest to warrant departing from the arbitrary and capricious

standard," where court was aware of insurance company's litigation history and

which caused court to look particularly closely at record in case); *Rizzi v.*

*Hartford Life & Acc. Inc. Co.*, 383 F. App'x 738, 750 (10th Cir. 2010) ("we cannot

presume bias on the part of UDC based upon facts presented to another court

more than two years ago . . . [plaintiff] identifies no admissible evidence of a significant financial incentive by MAG or UDC to decide claims in Hartford's favor. Even more telling, [plaintiff] presents no evidence of an inherent bias or unreasonableness by [the vendors' reviewing doctors]. . . . General accusations of bias against [the doctors] do not provide a reason to doubt what otherwise appear to be competent and reasonable opinions.").

Thus, the Court cannot find that Hartford's decision to credit the reports of Drs. Brenman and Livingstone was arbitrary or capricious (especially in light of the substantial evidence supporting their reports, discussed *supra*); nor can it find to be arbitrary or capricious Hartford's reliance on outside vendors to independently review a claimant's application for benefits.

c.  <u>Approval of Award of Social Security Disability Insurance Benefits</u>

Carroll contends that the Policy administrator failed to provide a full and fair review of her benefit denial upon appeal because Hartford failed to consider Carroll's award of Social Security Disability Insurance ("SSDI") benefits.  This contention, though, is unfounded.  SSDI benefit determinations are not binding on ERISA plans but may be considered in a plan's review of a claimant's request for benefits.  *See Paese*, 449 F.3d at 442 ("The court acted well within its discretion when it considered the SSA's findings as some evidence of total disability, even though they were not binding on the ERISA Plan, and even though the SSA's definition of disability may differ from that in the Sequa Plan.").

Here, Carroll provided the Notice of Approval of SSDI benefits to Hartford upon her appeal.  She included no indication of what evidence she submitted in support of her claim for SSDI benefits, and the Social Security Administration offered no explanation of its finding in the document provided to Hartford. Further, there is no indication in the record that Hartford failed to consider this award; in fact, Hartford's July 15, 2010 letter notifying Carroll of the denial of her appeal specifically noted that the "decision to uphold the denial of this claim is based upon [the evidence used in the initial determination of denial], and the following additional information," including the "Notice of Approval for Social Security Disability benefits."  [Dkt. 23-3, H129-130].

The Court further notes the notable difference between a Social Security Disability benefit review and a review of a denial of a benefit under ERISA.  The Second Circuit has noted that, "unlike the [Social Security Administration], ERISA Plan administrators need not give special deference to a claimant's treating physician."  *Paese*, 449 F.3d at 442.  According to this "treating physician rule," the opinion of a claimant's treating physician as to the nature and severity of the impairment is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2). Even the Social Security Administration need not give deference to a treating physician's opinion which is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with the other substantial evidence in the record and instead is based solely on

conjecture and the patient's subjective complaints.  Here, where Dr. Norris' and Drs. Brenman's and Livingstone's opinions differed, Hartford was not obligated to credit Dr. Norris' opinions as to Carroll's functional abilities (which were founded not on medical examinations but on Carroll's own subjective statements regarding her abilities) over those of the two independent reviewing physicians, both of whom worked for different agencies, reviewed Carroll's file at different points in the claims process, and who came to the same medical conclusions as to her probable functional capacity independently.  Even under the "treating physician rule" the Social Security Administration would not have had to credit Dr. Norris' opinions.  Thus, if the determination to award SSDI benefits was based on Carroll's treating physicians' opinions, that decision does not necessarily hold sway over the Policy administrator.

Lastly, the Court notes that *if* Hartford were to accord serious weight to the SSDI benefit determination, Hartford could conclude based on the limited information provided that Carroll was not disabled during the Elimination Period, as the Social Security Administration specifically found Carroll's onset date of disability to have been July 24, 2009.  That date is more than five months after the start of the Elimination Period.  Without more information about the Social Security Administration's findings, this notification of award suggests that Carroll was *not* disabled up to the point of disability onset.

In *Paese v. Hartford Life and Acc. Ins. Co.*, the Second Circuit noted that although "the SSA's determination did not bind either the ERISA Plan or the district court," "it does not follow that the district court was obligated to ignore

**54**

the SSA's determination, especially if the district court found the determination probative, if not necessarily dispositive."  449 F.3d at 443.  Here, although Hartford failed to explicitly detail its conclusions as to the Notice of Approval, there is no evidence to corroborate Carroll's contention that Hartford did not consider the Approval at all, especially in light of the fact that the Notice was specifically listed in the July 15, 2010 denial letter as one of the documents reviewed and considered in the denial of LTD benefits.  Furthermore, the Second Circuit has recently held that a plan administrator's failure to explain its reasons for concluding that a claimant is not disabled where the Social Security Administration reached the opposite conclusion does not necessarily render a denial of benefits arbitrary and capricious.  In *Hobson v. Metro. Life Ins. Co.*, the Second Circuit concluded the following:

> We encourage plan administrators, in denying benefits claims, to explain their reasons for determining that claimants are not disabled where the SSA arrived at the opposite conclusion: Doing so furthers ERISA's goal of providing claimants with additional information to help them perfect their claims for subsequent appeals. Nonetheless, especially in light of the substantial evidence supporting its determination, we decline to hold that MetLife's failure to do so in this case renders its denial of Hobson's LTD benefits claim arbitrary and capricious.

574 F.3d 75, 92 (2d Cir. 2009).  Similarly here where the record is devoid of any evidence of the Social Security Administration's reasoning, Hartford's failure to distinguish its reasoning or to deny LTD based on the Social Security Administration's determination of the date of disability onset specified in its award letter is not evidence of arbitrariness and capriciousness.  Hartford's

denial of benefits was based on substantial evidence, as discussed above.  That consideration, along with the paucity of information in the Notice of Approval itself and the further considerations discussed above, does *not* render Hartford's denial arbitrary or capricious, nor does it Hartford's failure to discuss the particulars of this evidence in detail in its July 15, 2010 letter.

### d.  Grant of Short Term Disability Benefits

Finally, Carroll contends that Hartford's denial was arbitrary and capricious because Hartford's approval of her claim for STD benefits is inconsistent with its denial of her request for LTD benefits.  This argument is likewise unavailing.  While Hartford determined that Carroll was disabled for purposes of short term disability benefits, she makes no claim that Hartford made this determination based on the same information on which it made the decision that she was *not* disabled for purposes of long term disability benefits.  In other words, Carroll provides no evidence that the body of facts actually reviewed for purposes of short term and later long term disability benefits was the same.  Moreover, by the terms of the Policy, Carroll was required to apply for and bore the burden of proving her entitlement to long term disability benefits.  She was not automatically entitled to LTD simply because she was paid STD, even though she had received short term disability benefits during the Elimination Period.  Receipt of short term disability benefits under the terms of the Policy constitutes neither requirement nor a qualifier for entitlement to long term disability benefits.

56

Hartford based its determination to deny Carroll's claim for LTD benefits on her inability to present sufficient evidence to establish that she could *not* work a full day or week.  She presented no evidence in the first instance, and so Hartford sought the opinion of an independent medical records reviewer (Dr. Brenman), who concluded that Carroll was in fact capable of performing her job on a full-time basis.  On appeal, a second independent medical expert (Dr. Livingstone) concluded similarly.  Based on the substantial evidence in Carroll's long term disability benefits record, Hartford's denial of her claim was not arbitrary or capricious even though Hartford had previously paid her short term disability benefits.

**V.** **Conclusion**

For the foregoing reasons, the Court cannot conclude that Hartford's decision to deny Plaintiff long term disability benefits was arbitrary or capricious. Defendant's Motion for Summary Judgment is thus GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.  The Clerk is directed to enter judgment in favor of Defendant and to close this case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 28, 2013